[Cite as *Rericha v. Dept. of Rehab & Corr.*, 2025-Ohio-1793.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Michael Rericha et al., | : | |
| Plaintiffs-Appellees, | : | |
| | | No. 24AP-240 |
| v. | : | (Ct. of Cl. No. 2019-01000JD) |
| Ohio Department of Rehabilitation and Correction et al. | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellants. | : | |
| | : | |

D E C I S I O N

Rendered on May 20, 2025

**On brief:** *Lazzaro Luka Law Offices, LLC*, and *Lori A. Luka* for appellees Michael Rericha and Karen Rericha. **Argued:** *Lori A. Luka*.

**On brief:** *Dave Yost*, Attorney General, and *Daniel R. Forsythe*, for appellants. **Argued:** *Daniel R. Forsythe*.

APPEAL from the Court of Claims of Ohio

BEATTY BLUNT, J.

{¶ 1} Defendants-appellants, the Ohio Department of Rehabilitation and Correction ("ODRC") and Office of Risk Management, appeal the decision of the Court of Claims of Ohio rendering judgment in favor of plaintiffs-appellees, Michael and Karen Rericha, in the total amount of $945,491.56. Following trial, the magistrate granted judgment to the appellees in the amount of $945,491.56, and the trial court subsequently overruled the appellants' objections and affirmed the decision of the magistrate.

{¶ 2} On October 26, 2017, an ODRC vehicle rear-ended the 2016 Prius that appellee Michael Rericha was driving. Then, on November 8, 2017, Michael was rear-ended again, in a second, unrelated collision with an automobile driven by a private citizen.

Michael and his wife Karen sued ODRC for negligence and loss of consortium, and the parties jointly entered a stipulation that ODRC "breached its duty of care and is liable for causing the accident on October 26, 2017 between the parties. It is agreed that this matter shall proceed to Trial on the issues of proximate cause and damages only." (Jan. 26, 2022 Stipulation at 1.)

{¶ 3} Michael had undergone a cervical spine discectomy and fusion in 1986 and had suffered a lower back injury from a motor vehicle collision in 1994, but had recovered from both and did not have any further neck or back complaints until after the October 26, 2017 collision. On that date, he was operating a motor vehicle owned by his employer and traveling on Interstate Route 80, when he was rear-ended by a motor vehicle owned by ODRC and operated by an employee of ODRC, Brian Hill. After that collision, Michael drove himself home, but upon arrival he noticed shakiness, left knee pain, left shoulder pain, and low back pain. He went to the emergency room of Lodi Community Hospital the following day, and was examined by Francis Mencl, M.D. Dr. Mencl testified at trial that Michael complained of back and neck discomfort and reported having had a headache and nausea, and that Michael reported pain at a level of six on a scale of ten. In Dr. Mencl's view, Michael's complaints were straightforward and Dr. Mencl did not order any imaging of Michael's neck or back. Instead, he wrote a prescription for a muscle relaxer to be taken twice daily for up to five days, recommended ibuprofen or a similar over-the-counter anti-inflammatory drug, and applying ice to alleviate swelling and pain. He instructed Michael to seek further medical attention if he experienced increased neck or back pain together with tingling or loss of feeling.

{¶ 4} But Michael's neck and lower back pain persisted, and while he returned to work at his new job—facilitating the sale and installation of home stairlifts—after a few days, he had a difficult time using stairs by himself and needed Karen to help him with climbing and measuring the stairs in a client's home. Accordingly, he scheduled an evaluation with the Advanced Spine Joint and Wellness Clinic in Medina, Ohio for November 9, 2017. But on the day before his scheduled appointment, his vehicle was rear-ended a second time, by a van driven by P.D. (a nonparty to this case). Michael testified that while the second collision had more impact on the vehicle, it was not necessarily worse for his injuries, as he believed that his pain symptoms after each collision were similar.

{¶ 5}   When he visited Advanced Spine Joint and Wellness Clinic the following day, Michael's neck, lower back, and knee were in substantial pain.  He was treated at the clinic for several months and was eventually referred to see a pain management doctor.  He then consulted for these injuries with his general practitioner, with a sports medicine specialist, an orthopedic surgeon, another cervical spine surgeon, a lumbar spine surgeon, and the Akron Spine Institute. He underwent numerous procedures and surgeries over the following five years in attempts to address his injuries, including cervical spine fusion, epidural injections, decompression surgery, another cervical spine surgery, another lumbar spine fusion and discectomy, and a radio ablation three weeks prior to the July 6, 2022 trial.  Despite all these procedures, Michael can no longer navigate stairs, can no longer engage in his hobbies of horsemanship or golfing, and has been required to strictly limit the gardening, woodworking, cooking, and yard work he performs. Most of the home and grounds upkeep must now be performed by Karen, and they were required to move from their large rural log home into a one-story home because Michael could not navigate the stairs.  Michael's personality has changed, he has become withdrawn and no longer attends many social or family functions, and his relationship with Karen has changed because they are no longer able to engage in many of the social activities they shared prior to the collisions.  Karen has become the family breadwinner and now works two jobs.

{¶ 6}   Kevin Trangle, M.D., testified as an expert on behalf of the appellees. He described Michael's medical records and medical history, discussed his own November 5, 2020 examination and evaluation of Michael.  The magistrate observed:

> Discussing the nature of Michael's injuries, Dr. Trangle noted how after both collisions Michael reported lower back, neck, and left knee pain, and how he was similarly diagnosed after both collisions with a back and neck strain and left knee contusion. While acknowledging that the second collision was more severe, as it involved higher force and speed, and that Michael reported greater pain after the second collision, Dr. Trangle testified that the force of the first collision was still significant, especially for an individual of Michael's age and medical history. Indeed, according to Dr. Trangle the amount of force in the first collision was enough for a patient like this to sustain the stenosis, disc herniations and other harm that Michael was ultimately found to have. On the subject of photographs of Michael's vehicle taken after each of the collisions, Dr. Trangle testified that there is not necessarily a

direct correlation between the damage to a vehicle and injury, as there are many variables and he has seen great disparity going both ways.

Dr. Trangle discussed the nature of soft tissue injuries and the process of recovering from them and explained that if Michael had only sustained soft tissue injuries in the first collision, an older person with the preexisting degenerative changes that Michael had can take up to several months to recover, meaning Michael would have been in the acute phase of recovery at the time of the second collision. But Michael had persistent 5/10 or 6/10 pain between the collisions, and although he scheduled further medical evaluation for his injuries he had not yet undergone any diagnostic imaging before the second collision, Dr. Trangle stated, and in his opinion there is a high probability that Michael had more than just soft tissue injury from the first collision, such as aggravation of degenerative changes in the spine. At minimum, Dr. Trangle explained, the first collision, by causing ongoing inflammatory changes in the ligaments and tendons, made Michael more susceptible to further harm consistent with the harm seen later in imaging, but again, the first collision alone was enough to cause the harm that imaging later revealed. In Dr. Trangle's opinion, the degree to which Michael's injuries were caused by one collision versus the other cannot be pinpointed, as they are intertwined and indistinguishable. Thus, Michael's injuries are not divisible from a medical standpoint, according to Dr. Trangle, who opined within a reasonable degree of medical certainty that both collisions caused Michael's injuries, including shoulder and knee contusions along with substantial aggravation of preexisting cervical thoracolumbar degenerative disc disease and disc herniations.

Along the same lines, Dr. Trangle testified that if only the first collision or only the second collision had occurred he cannot opine what treatment would have been needed. But if neither collision had occurred, Dr. Trangle opined, Michael probably would not have needed all the treatment he received. In Dr. Trangle's opinion, the five surgeries and all the other medical treatment Michael received, amounting to $531,000 in expenses, was appropriate and was related to both collisions.

Significant medical intervention will be necessary for the rest of Michael's life, in Dr. Trangle's view, and it is highly unlikely he will be able to work again.

(May 26, 2023 Mag.'s Decision at 12-13.) Maryanne Cline, R.N., a life care planner, also testified. She indicated that she had prepared a plan that identified Michael's needs now and into the future, determined the costs of those needs, and added up the costs of those needs, with reference to his life expectancy. She concluded that Michael would reasonably require medical interventions during the remainder of his life that would cost a total of either $1,121,128 or $1,276,128, depending on whether or not he would need a spinal cord stimulator.

{¶ 7} Barbara Burk testified as a vocational rehabilitation expert, and determined that in her opinion, Michael is not a candidate for employment on a sustained basis. She stated that while at 66 years of age, many men have retired, but that the Social Security retirement age has been 65 and is going up to 67. She also testified that employers are often hesitant to hire individuals with disabilities, and that while Michael's work experience has limited transferability, he had told her that he liked working and had planned to continue working prior to receiving these injuries.

{¶ 8} Alex Constable, an economist, testified that assuming Michael is no longer a candidate for sustained employment activity as Burk concluded, and using the wage information from Acorn Stairlifts to determine the median income of surveyors working there, he placed the present value of Michael's lost earning capacity at $611,684. Looking at the total cost of Michael's future care as calculated by Cline, Constable calculated its present value at $1,252,358 when including the cost of the spinal cord stimulator. He calculated the present value of Michael's lost household services for the remainder of his life expectancy at $315,934.

{¶ 9} Douglas Morr, a biomechanical engineer and accident reconstruction expert, testified for ODRC. Morr explained that he was asked to review the available evidence for accident reconstruction and biomechanical purposes, to analyze both of the two collisions and compare them. Based on the available evidence, Morr concluded that the magnitude of the second collision was larger than that of the first and would be more likely to cause injury. Morr identified the materials that he reviewed, such as crash reports and photographs, and publicly available data on collision testing of the vehicle models involved. Morr authenticated a copy of the report he prepared, along with separate analyses and calculations for both collisions from reconstruction and biomechanics standpoints.

{¶ 10} Following trial, the magistrate's decision concluded that the harm Michael suffered as a result of the two collisions was not divisible:

> Discussing the nature of Michael's injuries, Dr. Trangle noted how after both collisions Michael reported lower back, neck, and left knee pain, and how he was similarly diagnosed after both collisions with a back and neck strain and left knee contusion. While acknowledging that the second collision was more severe, as it involved higher force and speed, and that Michael reported greater pain after the second collision, Dr. Trangle testified that the force of the first collision was still significant, especially for an individual of Michael's age and medical history. Indeed, according to Dr. Trangle the amount of force in the first collision was enough for a patient like this to sustain the stenosis, disc herniations and other harm that Michael was ultimately found to have. On the subject of photographs of Michael's vehicle taken after each of the collisions, Dr. Trangle testified that there is not necessarily a direct correlation between the damage to a vehicle and injury, as there are many variables and he has seen great disparity going both ways.

(Mag.'s Decision at 12.) The magistrate found that "[i]t was established that the actions of both [ODRC's agent and the private citizen] caused Michael injuries, including shoulder and knee contusions along with substantial aggravation of preexisting degenerative disc disease and disc herniations, and that *his injuries are not divisible between the two collisions*." (Emphasis added.) *Id.* at 27-28. The magistrate further observed:

> Michael's complaints and diagnoses after the collisions were similar and he had persistent pain between the collisions. The collisions were close in time and Michael was still in the acute injury phase following the first collision when the second one occurred. The specific extent of harm resulting from each collision could not be medically determined, but *it was established that the extent of the effect of the first collision was enough to substantially factor in Michael's injuries. Indeed, as established by Dr. Trangle, the amount of force in the first collision was enough for a patient like this to sustain all the injuries Michael was ultimately found to have.* Though ODRC, *without presenting an independent medical expert of its own*, argued that Michael only sustained soft tissue injury in the first collision, Dr. Trangle established that that there is a high probability Michael had more than just soft tissue injury from the first collision.

(Emphasis added.) *Id.* Accordingly, the magistrate concluded that following mandatory setoffs, "Michael is entitled to a total recovery of $795,466.56 and Karen is entitled to a total recovery of $150,000. Based upon the foregoing, it is recommended that judgment be entered for plaintiffs in the total amount of $945,491.56, which includes the $25 filing fee paid by plaintiffs." *Id.* at 34.

{¶ 11} The appellants filed objections to the magistrate's decision, arguing that the second collision was by far more severe and was the source of any of Michael's serious injuries and of the loss of consortium claim, and contends that "the second, unrelated accident (November 8, 2017) involving Michael had a more severe impact and was an intervening, superseding cause that cut off any causation/liability from the first accident." (Emphasis deleted.) (July 5, 2023 Defs' Objs to the Mag.'s Decision at 2.) But in a 26-page decision issued on March 8, 2024, the trial court overruled each of the appellants' objections, and stated:

> Upon independent review of the evidence, and comparing the backgrounds of the two experts, Mr. Morr has an extensive background as a professional engineer in biomechanics and evaluation of relevant force exposure on the human body in accident reconstruction, and Dr. Trangle has an extensive background as a doctor in occupational and environmental medicine and internal medicine. While Mr. Morr's testimony is competent and relevant on the forces exerted upon Michael in each collision, upon independent review of the evidence, Michael's symptoms tend to rely more on medical causation testimony of a medical doctor as sufficient evidence. The Court finds that Dr. Trangle is properly equipped with education and experience to opine regarding proximate causation of Michael's internal injuries based on calculated forces and the human body/injury mechanisms, whereas Mr. Morr is properly equipped to opine to the calculation of the forces present in a collision and could have opined to more certainty if Michael's injuries were sufficiently external. Accordingly, upon independent review of the evidence, the Court finds that the Magistrate properly found Dr. Trangle more credible than Mr. Morr on the issue of medical causation based on the forces in play during each collision.

(Internal citations omitted.) (Mar. 8, 2024 Decision at 13-14.) The ODRC and Office of Risk Management now appeal that judgment, asserting six assignments of error:

> 1. The Court of Claims erred as a matter of law in finding that Michael's injures were indivisible.

2. The Court of Claims erred as a matter of law in finding that Michael's injures were not capable of apportionment.

3. The Court of Claims incorrectly found that Appellants did not provide any evidence that Michael only suffered a soft tissue injury.

4. The Court of Claims erred in concluding that the second tortfesasor [P.D.] was not an intervening and superseding cause that cut off Appellant's liability.

5. The Court of Claims incorrectly applied the theory of the eggshell plaintiff.

6. The Court of Claims erred in finding that Appellants are liable for a total judgment of $945,491.56.

In addressing these assignments of error, we must observe that the appellants have mistakenly framed this dispute as a purely legal one, subject to de novo review. Not so. While the trial court was certainly required to "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law," Civ.R. 53 (D)(4)(d), our review is different, and "varies with the nature of the issues that were (1) preserved for review through objections raised before the trial court and (2) raised on appeal by assignment of error." *Lenoir v. Ohio Dept. of Rehab. & Corr.*, 2020-Ohio-387, ¶ 10 (10th Dist.), citing *Feathers v. Ohio Dept. of Rehab. & Corr.*, 2017-Ohio-8179, ¶ 10 (10th Dist.). Generally, we review the trial court's decision to adopt, reject, or modify a magistrate's decision for an abuse of discretion. *Lenoir* at ¶ 10 (citing cases). And while "no court has the authority, within its discretion, to commit an error of law," *id.*, quoting *Shaw v. Underwood*, 2017-Ohio-845, ¶ 25 (10th Dist.) (internal citations and quotations omitted), only such questions of law are reviewed de novo on appeal. *Lenoir* at ¶ 10 (citing cases). Here, because the appellants stipulated liability for the collision, the case was tried "on the issues of proximate cause and damages only." (Jan. 28, 2022 Mag.'s Order at 1.) The issues regarding damages are primarily factual ones subject to review for an abuse of the trial court's discretion. Because it is true that a few of those factual questions are intertwined with legal ones we must sometimes analyze them under the stricter standard, but in general the state has improperly characterized our function in this case.

{¶ 12} In its first, second, and third assignments of error, the appellants repeatedly argue that the trial court erred by concluding that the injuries were not divisible. The trial court held that "the Magistrate correctly determined that 'Michael demonstrated by a preponderance of the evidence that the conduct of each tortfeasor in the first and second collisions was a substantial factor in producing his harm,' " and also that "upon independent review of the evidence, the Court finds that Plaintiffs produced sufficient evidence for the Magistrate to conclude Michael suffered indivisible harm from the two collisions." (Mar. 8, 2024 Decision at 16.)

{¶ 13} Ohio law clearly recognizes that there may be more than one proximate cause of harm to a plaintiff. *See, e.g., Keleman v. Williams*, 1993 Ohio App. LEXIS 1325, *11 (10th Dist. Mar. 4, 1993), citing *Taylor v. Webster*, 12 Ohio St.2d 53 (1967). " 'Where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm.' " *Sotos v. Edel*, 2003-Ohio-6471, ¶ 42 (10th Dist.), quoting *Pang v. Minch*, 53 Ohio St.3d 186, (1990), paragraph five of the syllabus. However, the "substantial factor test as spelled out in *Pang* does not change the traditional concepts of proximate cause in cases where the actions of more than one tortfeasor join to cause a single, indivisible injury to a plaintiff." *Pancoe v. Dye*, 1992 Ohio App. LEXIS 5419, *11 (9th Dist. Oct. 21, 1992). Once an appellee has met the burden of demonstrating that the conduct of each tortfeasor was a substantial factor in causing an indivisible injury, "a prima facie evidentiary foundation has been established supporting joint and several judgments against the defendants. Thereafter, the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment." *Pang* at 197. *See also* Restatement of the Law 2d, Torts, § 433 B(2) (1965).

{¶ 14} Here, as both the magistrate and the trial court observed, the appellants did not present expert medical testimony on the divisibility of Michael's injuries—the only evidence that addresses the issue favorably to the state is the testimony of Dr. Francis Mencl, who treated Michael at the ER after the first accident and did not order any imaging. As the trial court correctly observed:

> While it is true that treating emergency room physician Dr.
> Mencl initially diagnosed Michael with a soft tissue injury,

cervical strain, in the emergency room after the first collision, Dr. Mencl's testimony did not establish Michael's final diagnosis given other credible expert testimony. Dr. Mencl testified that a cervical strain could take several weeks or longer to heal, specifically in an individual like Michael who suffered from pre-existing conditions, such as his degenerative disc disease and prior cervical fusion, which was corroborated by Dr. Trangle. Therefore, upon independent review of the evidence, Dr. Mencl's emergency room diagnosis is not irrefutable evidentiary proof of Michael's ultimate injuries.

(Mar. 8, 2024 Decision at 15.) It is undisputed that Michael continued to experience aggravated symptoms and pain before the second collision, and that he was scheduled to receive additional treatment for this pain the day after the second collision occurred. Accordingly, Dr. Mencl's testimony is not inconsistent with the trial court's decision on this issue—in fact, it is supportive of it.

{¶ 15} The appellants have attempted to suggest that Mr. Morr, their accident reconstruction expert, was able to testify that the second accident was more likely to cause the type of injuries that Michael suffered. Even if we allow their argument that Mr. Morr has expertise to opine on this issue (something we seriously doubt), his position on this matter is purely speculative and is directly contradicted by Dr. Trangle's medical testimony. The trial court correctly found that "Dr. Trangle is properly equipped with education and experience to opine regarding proximate causation of Michael's internal injuries based on calculated forces and the human body/injury mechanisms, whereas Mr. Morr is properly equipped to opine to the calculation of the forces present in a collision and could have opined to more certainty if Michael's injuries were sufficiently external." *Id.* at 14. This conclusion is not legally erroneous, and it is certainly not an abuse of the trial court's discretion regarding how to weigh conflicting evidence.

{¶ 16} In their fourth assignment of error, the appellants argue that the trial court committed legal error by not finding that the second collision was "an intervening and superseding cause" cutting off their liability for Michael's injuries. But as the Supreme Court of Ohio has observed:

The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the

injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury.

In order to relieve a party of liability, a break in the chain of causation must take place. A break will occur when there intervenes between an agency creating a hazard and an injury resulting therefrom another conscious and responsible agency which could or should have eliminated the hazard. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury.

(Internal citations omitted.) *Berdyck v. Shinde*, 66 Ohio St.3d 573, 584-585 (1993). But like the question of apportionment discussed above, the burden to demonstrate a break in the chain of causation is on the party asserting that break. *See, e.g.*, *id.* at 585 (denying summary judgment) and *Pang*, 53 Ohio St.3d at 196 (describing the argument that "joint and several liability will result only where there is indivisibility of causation" as "flawed"). And again, the evidence that the appellants presented to the court is insufficient to demonstrate such a break—while it is theoretically *possible* that the harm which Michael suffers to this day was caused solely by the second collision, the only competent, credible evidence on the matter presented at trial was to the contrary. It was not an abuse of discretion for the trial court to hold that Dr. Trangle's testimony on the subject was more reliable than that of Dr. Mencl or Mr. Mott.

{¶ 17} In their fifth assignment of error, appellants assert that the trial court inappropriately applied the "eggshell skull" plaintiff rule, that " 'a defendant who negligently inflicts injury on another takes the injured party as he finds her, which means it is not a defense that some other person of greater strength, constitution, or emotional makeup might have been less injured, or differently injured, or quicker to recover.' " *Fleckner v. Fleckner*, 2008-Ohio-4000, ¶ 22 (10th Dist.), quoting *McDevitt v. Wenger*, 2003-Ohio-6096, ¶ 34 (5th Dist.). The rule generally states that "when a tortfeasor proximately caused the plaintiff's damages, the tortfeasor is liable for any superfluous damages resulting from the plaintiff's abnormal frailty or pre-existing condition." *Boroff v. Meijer Stores Ltd. Partnership*, 2007-Ohio-1495, ¶ 13 (10th Dist.), citing Restatement of

the Law 3d, Torts, § 31 (2005).  It is a "rule of damages that 'evolved in the context of preexisting injuries to provide that if a defendant's wrongful act causes injury, the defendant is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe . . . .' " (Internal citations omitted.)  *Weinkauf v. Pena*, 2020-Ohio-3293, ¶ 17 (10th Dist.).

**{¶ 18}** Here, the evidence at trial demonstrated that Michael had preexisting conditions that made him additionally susceptible to the injuries he suffered.  Appellants argue that they should not be responsible for the aggravation of those conditions, as the first collision "only caused a minor soft tissue injury" and they are "not responsible for the subsequent tortfeasor [P.D.] who found Michael with inflammatory changes . . . which made him more susceptible to being injured during the second accident."  (Brief of Appellants at 35.)  But this argument, like those before, rests on the flawed premise and unsupported conclusion that Michael's injuries from the two accidents are divisible, and because the appellants failed to support that premise and that conclusion with competent, credible evidence, the trial court correctly concluded that they are not.  Instead, the trial court correctly held that "[p]rior to the first and second collision, Michael had a preexisting history of degenerative disc disease and his prior cervical fusion.  And, prior to the second collision, Michael was also still in the acute phase of injury and recovery from the first collision."  (Mar. 8, 2024 Decision at 20.)  These conclusions are amply supported in the record, and the appellants have given us no basis upon which they should be disturbed.

**{¶ 19}** In their final assignment of error, the appellants again assert that the trial court erred by finding them responsible for the entire amount of damages.  For all the reasons set forth above, and because Ohio still recognizes the doctrine of joint and several liability, *see, e.g.*, *Bowling v. Heil Co.*, 31 Ohio St.3d 277, 288 (1987), their argument fails.  The appellants are free to seek contribution from the other tortfeasor.

**{¶ 20}** For all these reasons, appellants' six assignments of error are overruled, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

JAMISON, P.J., and MENTEL, J., concur.

———————————